Kevin A. Lipeles (Bar No. 244275)
  kevin@kallaw.com
Thomas H. Schelly (Bar No. 217285)
  thomas@kallaw.com
Andrew T. Magaline (Bar No. 290413)
  atmagaline@atmesq.com
LIPELES LAW GROUP, APC
880 Apollo Street, Suite 336
El Segundo, California 90245
Telephone: (310) 322-2211
Fax: (310) 322-2252

Attorneys for Plaintiff,
Joseph Cameron

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| Joseph Cameron, an individual, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF EL SEGUNDO; Chief Bill Whalen; Captain Carlos Mendoza; Captain Jamie Bermudez; Lieutenant Ray Garcia; Lieutenant Dan Kim; Lieutenant Jeff Leyman; Lieutenant Aaron Corkins; Lieutenant Hugo Perez; Scott Mitnick; and DOES 1-10, <br><br> Defendants. | Case No. 2:20-cv-04689-JFW-jc <br><br> **SECOND AMENDED COMPLAINT FOR DAMAGES** |

## SECOND AMENDED COMPLAINT FOR DAMAGES

Plaintiff Joseph Cameron, for his Second Amended Complaint against Defendants City of El Segundo, Scott Mitnick in his official capacity as City Manager of the City of El Segundo, Chief Bill Whalen, Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez, , and DOES 1 - 10, inclusive, alleges:

///

**INTRODUCTION**

1.      This civil rights and state tort action seeks compensatory and punitive damages from Defendants, and each of them, in connection with Defendants' approved, adopted, and ratified policies constituting a continuing pattern and practice of retaliation, discrimination, harassment, and intentional violations of the rights guaranteed to Plaintiff under the United States Constitution and California state law, and public policy.

**PARTIES**

2.      At all times herein mentioned, Plaintiff Joseph Cameron ("Plaintiff") was employed with the El Segundo Police Department ("ESPD") and is an individual United States Citizen over the age of eighteen residing in Los Angeles County, California.

3.      Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, Defendant City of El Segundo ("City") was a municipal public entity violating laws within the State of California, County of Los Angeles. At all times pertinent hereto, Defendant City owned, controlled, and operated the law enforcement agency known as the El Segundo Police Department ("ESPD").

4.      Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, Defendant City was the employer of Defendants Scott Mitnick, Chief Bill Whalen, Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez, Scott Mitnick, and DOES 1-50, who were managerial, supervisorial, and policy making employees of ESPD and City, and DOES 51-100 who at all relevant times, were residents of Los Angeles County, California, and were working generally in the City of El Segundo, California.

5.      Chief Bill Whalen, Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez, Scott Mitnick, and DOES 1-100 were

employed by Defendant City and were acting within the course and scope of their employment with Defendant City and with authority as such agents and employees and with the consent and ratification of their co-Defendants and City.

6. At all relevant times Chief Bill Whalen, Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez, and DOES 1-100 (collectively referred to in their Official capacities a "Command Staff") were duly appointed supervising police officers and/or employees and/or agents of the City, subject to oversight and supervision by City's elected and non-elected officials.

7. The true names and capacities, whether corporation, associate, individual, or otherwise, of Defendants DOES 1-100 are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Each of the Defendants designated herein as a DOE is negligently or otherwise legally responsible in some manner for the evens and happenings herein referred to, and caused injuries and damages proximately thereby to Plaintiff, as herein alleged. Plaintiff will ask leave of Court to amend this Complaint to show their names and capacities when they have been ascertained.

8. At all times herein mentioned, Defendants were the agents, servants, and employees of each other, and at all times relevant hereto were acting within the course and scope of their authority as agents, servants, and/or employees and acting on the implied and actual permission and consent of the City.

9. Scott Mitnick ("Mitnick") is sued in his official capacity as City Manager of defendant City. As City Manager, Mitnick is authorized to delegate and has delegated his final decision and policy making authority to his subordinate department heads, including but not limited to Chief Bill Whalen. Plaintiff is informed and thereon believes that Mitnick has delegated this authority with regard to Police Department personnel, such as Plaintiff, to Chief Bill Whalen and that Mitnick knows of and/or approves of and/or is deliberately indifferent to the unconstitutional policies

1    and practices complained of herein.

2        10.    Plaintiff is unaware of any instance where Mitnick has overruled or
3    failed to strictly adhere to Chief Bill Whalen's decision, policy, and hiring
4    "recommendations," and thereon believes and alleges that Mitnick is the City's final
5    decision and policy maker in name only, and that all decisions and/or policy and/or
6    hiring and firing and authority with regard to the Police Department personnel have
7    been delegated to Chief Bill Whalen and are made by Chief Bill Whalen with
8    Mitnick's express and/or tacit approval such that Chief Bill Whalen is the *de facto*
9    final policy and decision maker with regard to all matters concerning the El Segundo
10   Police Department.

11       11.    Chief Bill Whalen ("Chief Whalen" or "Whalen") is sued in his
12   individual and official capacity as the duly appointed department head of the City of
13   El Segundo Police Department appointed by defendant Mitnick.

14       12.    Captain Carlos Mendoza ("Captain Mendoza" or "Mendoza") is sued in
15   his individual and official capacity.

16       13.    Captain Jamie Bermudez ("Captain Bermudez" or "Bermudez") is sued
17   in his individual and official capacity.

18       14.    Lieutenant Ray Garcia ("Lt. Garcia" or "Garcia") is sued in his
19   individual and official capacity.

20       15.    Lieutenant Dan Kim ("Lt. Kim" or "Kim") is sued in his individual and
21   official capacity.

22       16.    Lieutenant Jeff Leyman ("Lt. Leyman" or "Leyman") is sued in his
23   individual and official capacity.

24       17.    Lieutenant Aaron Corkins ("Lt. Corkins" or "Corkins") is sued in his
25   individual and official capacity.

26       18.    Lieutenant Hugo Perez ("Lt. Perez" or "Perez") is sued in his individual
27   and official capacity.

28       19.    Between 2014 and 2017, prior to his promotion to Lieutenant, Lt. Perez

was a member of the ESPOA Board of Directors. Lt. Perez was required to step down from the ESPOA Board of Directors before he was considered for promotion to Lieutenant.

## JURIDSICTION AND VENUE

20.    This civil action is brought for the redress of alleged deprivations of constitutional rights as protected by 42 USC §§ 1983, 1985, 1986, 1988, and the First, Fourth, and Fourteenth Amendments of the United States Constitution. Jurisdiction is founded on 28 USC §§ 1331, 1343. This Court has supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 USC § 1367.

21.    Venue is proper in this Court under 28 USC § 1391(b) because Plaintiff and Defendants reside in, and all incidents, events, and occurrences giving rise to this action occurred in the County of Los Angeles, State of California.

22.    On or about April 7, 2020, pursuant to Government code section 910, Plaintiff presented a Government Tort Claim to the City of El Segundo in full and timely compliance with the California Tort Claim Act for his state claw claims requiring presentation. On or about May 22, 2020, Plaintiff's Government Tort Claim was rejected.

23.    On February 20, 2020, Plaintiff filed a California Fair Employment and Housing Act ("FEHA") claim for all state law claims requiring such. That same day, Plaintiff obtained a Right to Sue letter regarding this matter from the Department of Fair Employment and Housing ("DFEH").

24.    On August 21, 2020, Plaintiff filed a supplemental Fair Employment and Housing Act ("FEHA") claim for all additional state law claims requiring such. That same day, Plaintiff obtained a Right to Sue letter regarding this matter from the Department of Fair Employment and Housing ("DFEH").

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

25.    Plaintiff repeats and realleges each of the allegations set forth above.

26.    At all times relevant to these claims, Plaintiff was a sworn peace officer

for the El Segundo Police Department, assigned to various units within the ESPD. Plaintiff held the rank of Police Officer.

27.     Plaintiff also has served, and continues to serve, as the President of the Board of Directors for the El Segundo Peace Officers' Association ("ESPOA"). Plaintiff had the right to form, join, and participate in the activities of employee organizations, such as ESPOA, of his own choosing for the purpose of representation on all matters of employer-employee relations, pursuant to Cal. Gov't Code § 3502.

28.     ESPOA and City had entered into a Memorandum of Understanding ("MOU") that was in effect during all times relevant to this complaint. Pursuant to the MOU, ESPOA was, and is, the exclusively recognized employee organization for all personnel employed by City in the unit of representation including the following classifications and positions: Police Sergeant and Police Officer.

29.     Plaintiff was qualified for the positions he held by reason of his education and training. During the course of his employment with the City has performed his various responsibilities as a police officer in an exemplary fashion and otherwise capably performed each and every condition of his employment agreement.

30.     Initially, Plaintiff was considered a "golden child" on the fast track to becoming sergeant; however, after Plaintiff was elected as president of ESPOA Board, his career advancement has halted, and he has been subject to retaliation and discrimination in his employment by reason of his title of president of ESPOA.

31.     Beginning in or around 2014, ESPOA board of directors and members, including Plaintiff, began publicly speaking out against proposed City of El Segundo budget cuts that they believed would negatively impact the effectiveness of ESPD. In or around 2016, the POA also publicly supported certain candidates in City Council elections.

32.     Plaintiff and ESPOA had a booth at the El Segundo Farmer's market where they distributed flyers they had created. The flyers contained statistics showing the increase in crime in El Segundo and that while nearby cities had hired new

- 6 -

officers, El Segundo had hired zero officers. The flyers stated "We Don't Want Raises! Keep El Segundo Safe and Stop the Cuts!"

33.    Plaintiff and ESPOA also created and distributed similar political mailers, created political videos, and purchased a roving billboard that could be driven around the city that displayed a "Stop the Cuts!" message. ESPOA also attended, spoke at, and held rallies at City Council meetings.

34.    ESPOA Board of Directors ("Board") have been in the limelight after deciding to get heavily involved in El Segundo politics. For example, in 2014, when the City of El Segundo tried to implement a 20 percent cut to officers' pay and benefits, Plaintiff acting on ESPOA's behalf, implemented a political campaign to educate residents and business owners of El Segundo. This political campaign was widely disliked by City Staff, El Segundo elected officials, and ESPD Command Staff members (i.e., Chief, Captain, and Lieutenants), as it had never been done before.

35.    Beginning in or around 2014, shortly after ESPOA began its campaign, Defendants, and each of them, excluding Corkin and Perez, began a pattern of harassment, discrimination, and retaliation against the ESPOA board of directors and, in particular, Plaintiff for his involvement with ESPOA, his association with ESPOA and its members and activities, his work for and with ESPOA, his speech associated with his work for and with ESPOA, and his free speech in general. His association and speech was, among other things, in favor of the officers and members of the public, and against certain members of the City, City government, the ESPD, and their policies, procedures, and acts.

36.    In 2016, ESPOA supported three candidates challenging incumbents in the El Segundo City Council election which was not well received by the City Council. El Segundo Mayor, Suzanne Fuentes, has on numerous occasions publicly stated her disapproval of ESPOA's political involvement.

37.    On September 30, 2016, ESPOA filed a grievance about staffing levels and mandates at ESPD. At a meeting to address the grievance(s), (former) Captain

Turnbull, stated that "the tail doesn't wag the dog," which Plaintiff, and any other reasonable person in Plaintiff's circumstances, interpreted to mean that the lower ranking officers such as Plaintiff and other ESPOA members and ESPOA Board members could not, and would not be permitted to, dictate and/or influence the policy decisions of Command Staff, and other superior officers, no matter the circumstance.

38.    In early 2017, Plaintiff, in his capacity as President of ESPOA, met with Chief Whalen regarding the grievance to which Chief Whalen instructed Plaintiff to "find some evidence" to support the grievance.

39.    Consequently, on September 13, 2017, a Public Records Request ("PRR") was filed for the emails of 1) Chief Whalen; 2) former Chief Mitch Tavera; 3) Captain Turnbull; 4) Captain Evanski; 5) Human Resources Director Lynn Lindberg; 6) Human Resources Director Marth Dijkstra; and 6) Greg Carpenter.

40.    In April 2018, Plaintiff met with Chief Whalen regarding the Public Records Request. Chief Whalen indicated he has never had a subordinate file a PRR claim against him. Whalen further stated that he had given up drinking for Lent but he was so mad that he began drinking again after Plaintiff filed the PRR. Plaintiff interpreted Whalen's statement as disapproval and condemnation of Plaintiff's lawful actions taken on behalf of and in his capacity as President of the Board of ESPOA.

41.    At the Annual ESPOA Meeting on October 11, 2018, when AB-392, the new 'use of force' bill, was brought up, Plaintiff, in his capacity as President of the Board of ESPOA, stated that it would be bad for law enforcement. ESPOA Board Vice President Brandon Browning repeated a statement from PORAC President Marvel who stated, "If [AB-392] passes, we will be firefighters and need to purchase sleeping bag." The next day, several members of Command Staff told Browning, who had just been promoted to Sergeant, that he had made inappropriate comments at the ESPOA meeting. They also told Browning to not let Plaintiff influence him and, now that he was a sergeant, officers, including Plaintiff, would test his authority.

42.    On January 10, 2019, there was an email notification regarding a new

- 8 -

"Body Camera" and "In-Car Video" Policies which were to take effect on January 15, 2019. However, these policies had been implemented by Lt. Garcia without meeting and conferring, in violation of the MOU between City and ESPOA.

43.    Accordingly, Plaintiff, in his capacity as President of the Board of ESPOA, requested a meeting with Captain Mendoza to address the violation of the MOU, and on January 22, 2019, a meeting was held which McEntyre, Black, Browning, Gill, Cameron, O'Connor, Mendoza attended. ESPOA brought forward the allegation to Captain Mendoza, who did not believe the allegation and, as such, the meeting was a fruitless and no further action was taken by Mendoza or Command Staff to rectify the blatant MOU violation.  This held until Plaintiff got their labor attorney involved and forced attorneys from both sides to meet on the issue. Later, Captain Mendoza told Plaintiff he could not believe it came to a point where both sides needed their attorneys involved.

44.    In early 2018, Plaintiff and Chief Whalen met regarding an issue brought to Plaintiff's attention about Lieutenants taking unmarked cars home because the department had run short on unmarked cars.  This became an issue because officers had no unmarked vehicles to drive when they needed to work an undercover capacity and/or go to court.  Plaintiff learned that Patrol Lieutenants, Internal Affair Lieutenants, and other rank and file Lieutenants were taking unmarked vehicles home, which, before, was only commonly done by the Detective Lieutenant.  With this new rule, it caused ESPD officers were forced to take marked ESPD Patrol vehicles to court instead of the unmarked vehicles, causing new issues in the Patrol ranks.

45.    After that meeting, Chief Whalen privately asked ESPOA Board Member Sgt. Gill to tell Plaintiff and the ESPOA Board to drop the complaint and let Chief Whalen to continue allowing Lieutenants to take the City's cars home and use the City's gas to do so, even though the complaint was a matter of significant public concern because the Lieutenants did not reimburse the City for use of City owned

vehicles or for the use of the City's gasoline that was purchased with taxpayer funds, which was a violation of one or more California and/or federal statutes and/or regulations including, but not limited to, violations of the California Penal Code, the California Revenue and Taxation Code and Regulations, the Internal Revenue Code and related federal Treasury Regulations.

46.    In early February 2019, Captain Bermudez emailed all ESPD officers and told them that they need to take their own personal vehicles to court and were no longer allowed to take department vehicles as there were insufficient marked vehicles to use. Plaintiff, in his capacity as ESPOA President, tried to resolve this issue with Command Staff but was met with negative results.

47.    Thereafter, on or about February 27, 2019, Plaintiff, as president of ESPOA, emailed all ESPD officers and ESPOA members advising them to take an "UBER" to Court and ESPOA would reimburse the officers. The ESPOA Board decided to take this action because ESPD officers and ESPOA members did not feel safe taking their own personal vehicles to court because ESPD officers and ESPOA members were now required to park in the same parking structure as the suspects, arrestees, and other defendants.

48.    Instead of coming up with a compromise and working with the ESPOA Board to devise an appropriate solution, Defendant City and Command Staff told the ESPOA Board members that this was a "direct shot at the Lieutenants" and has been held against the each and every ESPOA Board members since the ESPOA Board decided to implement the reimbursement policy.

49.    On or about May 6, 2019 through May 10, 2019, at the Team Building Workshop (TBW) in Temecula, California, Lt. Leyman announced to two separate groups that he would be retiring two years early because of a group of officers who were spreading lies about him. During his first announcement, Lt. Leyman refused to say who the "officers" were and said he did not want to resolve the issue because retiring would be easier; however, it was understood to everyone present that the

"officers" included Plaintiff and the other ESPOA Board Members.  Lt. Kim, who was present at the first announcement, responded to Lt. Leyman that "We need to isolate them. We can't reward them." At the second announcement, Lt. Perez commented to the second group, consisting of supervisors, that these people (referring to the officers) are a "cancer."

50.    On or about May 13, 2019 through May 17, 2019, during three consecutive briefings, Sgt. Delmendo repeated Lt. Leyman's announcement to several patrol officers. At the briefings, Sgt. Delmendo stated, "I'm going to do some digging into this. I'm going to get to the bottom of this, because what they did to Jeff [Lt. Leyman] was wrong."

51.    On May 21, 2019, Plaintiff, in his capacity as ESPOA President, met with Chief Whalen because although unstated, it was widely understood and intended that the "group of officers spreading lies," and the "they" referred to by Lt. Leyman, Lt. Kim, Lt. Perez, and Sgt. Delmendo were Plaintiff and the other ESPOA Board members.

52.    At the meeting, Chief Whalen could not or would not say whether "those officers" were Plaintiff and the ESPOA Board of Directors, however, Chief Whalen agreed and had "assumed" that Plaintiff was one of "those officers."

53.    When Plaintiff asked why, Chief Whalen said that, after personally speaking with Lt. Leyman, Whalen felt that Lt. Leyman was upset about a letter Plaintiff had written to Chief Whalen regarding the handling of, and decision not to hire, former ESPD Officer, Valerie Cameron, Plaintiff's spouse.

54.    Plaintiff expressed that he felt that Lt. Leyman had told Command Staff that Plaintiff and the ESPOA Board members are the "liars," and, as a result, Command Staff was retaliating and discriminating against Plaintiff and his Board members solely based on the lawful actions of Plaintiff and the ESPOA Board in their representative capacities. In response, Chief Whalen advised Plaintiff that Lt. Leyman *may* have shared that information with Lt. Kim and Lt. Garcia because of their close

relationship outside of work.

55.    Chief Whalen stated that ESPOA Board and Command Staff need to get together in a room to address this issue and indicated either hiring a "marriage counselor" or doing an activity like "an escape room" would help address this massive toxic environment.

56.    Chief Whalen told Plaintiff that this is the worst shape the department has been in since he began working at ESPD. Hearing Chief Whalen's explanation solidified Plaintiff's belief that the "liars" referenced by Lt. Kim were Plaintiff and the other ESPOA Board members.  Continuing since Plaintiff's May 21, 2019 meeting with Chief Whalen, Lt. Leyman's demeanor changed towards Plaintiff and Lt. Leyman is constantly "short" and appears perpetually upset with Plaintiff.

57.    On or about May 22, 2019, in a meeting with Captain Mendoza, Plaintiff again raised concerns about Lt. Leyman calling Plaintiff and the ESPOA Board members "liars." Captain Mendoza replied that there was nothing that could be done and that it would just go away on its own and that Plaintiff needs to get over it.

58.    Plaintiff offered to attend the Command Staff in his capacity as President of the ESPOA Board so that Plaintiff could directly address the issue himself. Captain Mendoza replied that he did not want to do that because all members of Command Staff would back Lt. Leyman no matter who is right or wrong and further indicated that he would not want to be alone in that room.

59.    Plaintiff reasonably interpreted Mendoza's statement as intimidation and/or a threat of physical violence and/or career suicide should Plaintiff continue to press the matter and insist on attending a Command Staff meeting and on directly addressing Command Staff concerning Plaintiff's legitimate concerns.

60.    At the El Segundo Sergeant Promotability Day, on or about October 2019, Plaintiff and other ESPOA Board Members met with Chief Whalen to discuss a test question that was illegally leaked to certain candidates who took the Sergeant exam. After explaining the situation, Chief Whalen was visibly upset and indicated

an Internal Affairs investigation would be conducted. This violation of illegal leaking of an exam question was reported to the highest-ranking officer in the department (Chief) pursuant to the MOU and the Department Rules and Regulations.

61.    Approximately two hours thereafter, Plaintiff and the other ESPOA Board Members were called back into Chief Whalen's office. At this second meeting, Captain Mendoza, the one who allegedly leaked the question, was also present.

62.    Captain Mendoza was visibly upset because he thought that Plaintiff and other ESPOA Board Members made the allegation about Captain Mendoza leaking the question.

63.    Mendoza stated that there was no leaked question because he was the only one who took the exam prior to the candidates taking the exam. Mendoza further stated that the question he told a few sergeants was a "hypothetical question."

64.    Plaintiff later confirmed that the exact question was in fact leaked to Sgt. Mike Gill and Sgt. Ryan Danowitz and, that exact question was told only a select few of the candidates in the promotional process.  All other candidates in the promotional process were not privy to this information.

65.    Every year, the ESPOA has paid for and held the ESPOA Fishing Tournament in June Lake, California, which both ESPOA members and a few members of Command Staff attend. However, in 2019, the ESPOA Board cancelled the ESPOA trip because almost 90% of the membership could not attend. Cancelling the event was held against the ESPOA Board Members and they were told by Chief Whalen and other members of Command Staff that the cancellation was interpreted as a "shot against Command Staff."

66.    After (former) Captain Bob Turnbull's retirement, the ESPOA Board decided it would no longer purchase retirement posters for members of the Police Management Association ("PMA") because members of PMA fell outside of ESPOA's bargaining group and PMA collected their own dues for their membership. This decision was also held against Board.

67.     On November 6, 2019, Plaintiff, in his individual capacity, met with Captain Bermudez regarding Plaintiff's yearly evaluation. Captain Bermudez listened to Plaintiff's concerns and said Plaintiff had three options: 1) leave it alone; 2) write and file a rebuttal; or 3) write and file a rebuttal but speak with Lt. Kim first to get some of the answers that he (Captain Bermudez) could not answer. Specifically, Captain Bermudez told Plaintiff to find out the exact issues Lt. Kim was referring to in the yearly evaluation. Captain Bermudez indicated that he had recently spoken with Lt. Kim and believed it would be in Plaintiff's best interest to go in and ask the questions directly to Lt. Kim

68.     As suggested by Captain Bermudez, Plaintiff approached Lt. Kim's office and asked to speak with him about his evaluation.  Lt. Kim sat down in his chair and Plaintiff began asking questions to which Lt. Kim gave only one reason why he dinged Plaintiff, which he felt were Plaintiff's "communication skills." When asked questions about "communication" Lt. Kim became visibly agitated and angry with the questioning and his tone of voice changed, and he became visually upset.

69.     Plaintiff felt intimidated for asking questions about his evaluation because Lt. Kim was defensive and upset with him and began to stare at him. When Plaintiff asked him specifically about the lack of communication within the Community Engagement Division, Lt. Kim sat up in his chair and stated, "So now you are criticizing my supervisory skills?"

70.     Plaintiff assured Lt. Kim he was speaking about "communication" as a whole, but Lt. Kim just stared at him, refusing to say anything. At this point, feeling intimidated, Plaintiff wanted to get out of the situation as fast as possible as it became clear that he was not allowed to ask any specific questions about his evaluation. The periods of silence and Lt. Kim consistently staring without speaking made Plaintiff very uncomfortable and he feared this "conversation" would be held against him later, even though it was suggested by Captain Bermudez.

71.     Then Lt. Kim asked Plainitff, "What makes you above standard?"

Plaintiff advised Lt. Kim that he felt uncomfortable at that moment. Plaintiff couldn't think because he felt intimidated and wanted to leave. Lt. Kim asked again, "What makes you above standard. What have you done?"  After asking each of these questions, Plaintiff repeatedly told Lt. Kim that he felt uncomfortable, indicated he wanted to leave, and that he would just write a rebuttal to the evaluation. After Plaintiff spoke each time, Lt. Kim didn't answer and would just stare at him for a few seconds.

72.    After another period of silence, Lt. Kim (still staring at Plaintiff) called Plaintiff an "officious person," Lt. Kim's tone of voice raised, and he seemed extremely upset with Plaintiff. Lt. Kim then went on to give an example during an ESPD station tour where Plaintiff "ordered children around."  However, this example was not in Lt. Kim's evaluation and the incident was never brought before up to Plaintiff's attention, was never documented and Plaintiff knew nothing about it. Plaintiff explained that he had never "ordered any children" during a station tour. Lt. Kim continued to stare at Plaintiff after when Plaintiff said that he did not know what Lt. Kim was talking about."

73.    Feeling intimidated and fearful of asking questions about his evaluation, Plaintiff advised Lt. Kim that the conversation seemed to be going nowhere and Plaintiff would just leave. In a very threatening and intimidating tone, Lt. Kim told Plaintiff that Lt. Kim was not done talking and told Plaintiff to "sit down." Plaintiff advised Lt. Kim that he did not feel comfortable anymore and that Plaintiff wanted to leave.  Plaintiff then stood up from the chair and attempted to leave the room.  Lt. Kim raised his voice even louder and said, "sit down," which Plaintiff interpreted as an official order and, in fear of insubordination, complied with Lt. Kim's order.

74.    Lt. Kim then indicated he did not like Plaintiff's "tone" and Plaintiff should "watch his tone." Plaintiff complied. Plaintiff repeatedly told Lt. Kim that he did not feel comfortable and told Lt. Kim that Plaintiff wanted to leave several times, but Lt. Kim refused to let him leave and continuously asked Plaintiff to go into

Captain Bermudez' office. When Plaintiff repeatedly told Lt. Kim that he was not comfortable, Lt. Kim would stare at Plaintiff for a few seconds and ask, "Why?" several times.

75.    After approximately the fourth time being asked, and in an effort to get out of his current situation, Plaintiff complied with Lt. Kim and they walked to Captain Bermudez' office. Lt. Kim entered the office as Plaintiff stood in the hallway and waited. Approximately five minutes later, Lt. Kim exited the office and said that Captain Bermudez could not meet until tomorrow.

76.    Plaintiff then saw Captain Mendoza in the hallway and informed him of the incident that had just occurred and how he felt threatened and was "the most hostile situation he had ever been involved in his career."

77.    When Captain Bermudez exited his office, Plaintiff told Captain Bermudez that was the most unprofessional and hostile event he had ever been subjected to and it was unacceptable that it was being allowed to occur, to which Captain Bermudez replied "okay," and went into the Command Staff meeting.

78.    That same day, Plaintiff reported the incident to Captain Bermudez (and Captain Mendoza was CC'ed) via email. Plaintiff indicated that he wanted it on record that what happened in Lt. Kim's office was unacceptable, hostile, and intimidating. The written reporting was in compliance with both the MOU and ESPD General Orders Manual.

79.    On or about December 4, 2019, Plaintiff was called into Lt. Kim's office and, upon his arrival, Lt. Kim indicated they were going to Captain Bermudez's office.  When they arrived at Captain Bermudez's office, both Captain Bermudez and Captain Mendoza were already sitting there and Lt. Kim shut the door when Plaintiff walked in.

80.    Lt. Kim then handed Plaintiff an "Incident Report" for his behavior towards him during the aforementioned meeting. Plaintiff read over the "Incident Report," saw that it was not what he recalled happening but felt extremely intimidated

with three members of Command Staff in the room staring at him. Plaintiff signed the "Incident Report" only because he was ordered to and not because he agreed with the report, and Plaintiff requested a copy of the report.

81.    Plaintiff reported the incident to both Captains Bermudez and Mendoza in accordance with the General Orders Manual, thinking that either would investigate or allow Plaintiff to explain what happened. Since both Captains needed to go to the Command Staff meeting, there was no investigation or follow up. Instead, Plaintiff was written up for violating the policy regarding addressing ranking officers.

82.    On or about December 12, 2019, Plaintiff made a written personnel complaint to David Serrano, the ESPD Human Resources Director, pursuant to the General Orders Manual, which alleged various violations of GOM sections 138.30 and 138.35.

83.    On information and belief, Defendants City and Command Staff did not investigate Plaintiff's written complaint, and instead retaliated against Plaintiff by giving Plaintiff a false "write-up" based on a fabricated story which did not occur.

84.    Since filing the written personnel complaint, Plaintiff has been continually subjected to adverse employment decisions, including verbal discipline for trivial matters, constant isolation for normal communication within the Community Engagement Division, work schedule adjusted so there is no more flexibility as others within the division are allowed (thus impacting Overtime and employee accrued leave banks), and being held out of School Resource Officer related activities where El Segundo Elected Officials are involved.

85.    Command Staff continues to engage in a pattern of harassment and intimidation against Plaintiff and other members of ESPOA Board. In particular, Captain Bermudez has begun using the men's' restroom directly next to Plaintiff's desk, despite having to walk past no fewer than two other available men's' restrooms. Captain Bermudez is the only member of Command Staff that regularly uses the men's' restroom near Plaintiff's desk.  Each time that Captain Bermudez uses the

restroom nearest to Plaintiff, Captain Bermudez stares at Plaintiff as he walks in.

86.    On information and belief, Captain Bermudez uses the restroom near Plaintiff's desk as a form of visual intimidation and harassments, always ensuring that Plaintiff is aware that Captain Bermudez and other members of Command Staff are watching Plaintiff very closely.

87.    In addition to the other actions described herein, the actions of Defendants and each of them discriminated against Plaintiff's protected characteristics by denying him hire and/or promotion, and denied him additional work opportunities and assignments wherein Plaintiff could earn overtime, and/or other premium pay.

88.    In addition to the other actions described herein, the actions of Defendants and each of them retaliated against Plaintiff because Plaintiff reported and/or resisted any form of discrimination and harassment by denying Plaintiff hire and/or promotion, and denying him additional work opportunities and assignments wherein Plaintiff could earn overtime, and/or other premium pay.

89.    The City of El Segundo, Command Staff and other Superior Police officers including ESPD's Chief, Captains, and Lieutenants have discriminated against, retaliated against, harassed and violated certain rights protected by the US and California Constitutions and certain California state laws guaranteed to Plaintiff because Plaintiff blew the whistle, because he is a member of the ESPOA board, is the president of the ESPOA, and for exercising his duties as a member of the ESPOA Board and the ESPOA president, including, but not limited to, lobbying for certain pay requirements for the officers represented by ESPOA, standing up for his fellow officers members of the ESPOA, and also for being an active and participating member of El Segundo Police Department Peer Support Group.

90.    Despite Plaintiff's efforts, he has been unable to halt and/or find appropriate resolutions for the unlawful harassment, discrimination, and retaliation by Defendants, who are Plaintiff's superiors within the meaning of the California

Government Code and California Labor Code.

91.    Plaintiff's efforts have been in vain, deliberately ignored, and in some instances, are substantial motivating factors behind Defendants' continuing discrimination, harassment, retaliation, and deliberate violations of the rights guaranteed to Plaintiff by the US and California Constitutions, and by California Law, and as a result, Plaintiff's harms complained of herein are ongoing and continuing.

92.    On or about March 24, 2020, Chief Whelan issued a directive to (ordered) Plaintiff, in his capacity as president of ESPOA Board of Directors, that Plaintiff could not communicate with ESPOA members on how to process a COVID-19 exposure notice.

93.    The order was issued in response to a post on the private, "members only" section of the ESPOA website in which Plaintiff, as ESPOA president, disseminated instructions specifically provided to Plaintiff by the City's HR Director, David Serrano, as a result of the current world-wide pandemic.

94.    Moreover, Chief Whalen gave Plaintiff a written referral to speak with Mr. Serrano about the issue that is the substance of the "members only" post.  In addition to forbidding further such communications between Plaintiff and the ESPOA membership, Chief Whalen repeatedly stated that Plaintiff violated department policy by making the "members only" post.

95.    Less than two weeks after Plaintiff submitted his Government Tort Claim described supra, on April 20, 2020 at approximately 12:03 PM, Plaintiff received an email from his immediate supervisor, Sgt. Muir.  Plaintiff was confused by the email because it contained no subject line and the only text in the body of the email was "Sent from Snipping Tool."  When Plaintiff opened the email it contained a picture which Plaintiff immediately recognized as a copy or screen capture of his "Body Worn Camera" screen, with an indicator showing Plaintiff's location.

96.    At approximately 12:18 PM, Plaintiff responded to Sgt. Muir by text message asking what the purpose of the picture was.  Plaintiff received no response

1 from Sgt. Muir, but Plaintiff could see that Sgt. Muir had read the text.

2    97.    When plaintiff returned to the station he reviewed his body worn camera

3 (BWC) footage from the day. When Plaintiff reviewed his BWC, he could see that

4 Sgt. Muir had reviewed the BWC footage before Plaintiff.

5    98.    Since Sgt. Muir did not respond to Plaintiff's text and Plaintiff was

6 unsure whether Sgt. Muir needed Plaintiff to do anything, at approximately 1:00 PM

7 Plaintiff again texted Sgt. Muir seeking a follow up on the strange email. Plaintiff

8 could see that Sgt. Muir read the text message at approximately 1:50 PM.

9    99.    At approximately 3:00 PM, Plaintiff received a call over the radio to

10 report to the Watch Commander's Office.  When Plaintiff reported as ordered, Sgt.

11 Muir was present and instructed Plaintiff to close the door.

12    100.   Plaintiff looked to his left and Sgt. Danowitz as in the room as well.

13 Plaintiff found this odd because Sgt. Danowitz is not Patrol and is working Admin.

14 Trying not to cause a scene, Plaintiff sat down and Sgt. Muir immediately asked for

15 his body worn camera.

16    101.   Plaintiff told Sgt. Muir that it is in his patrol vehicle and Plaintiff was

17 instructed to get it. After retrieving the body camera, Plaintiff respond back into the

18 Watch Commanders Officer to both Sergeants.  Again, Plaintiff was asked to shut the

19 door and hand over his body camera.

20    102.   Plaintiff handed his BWC to Muir and Plaintiff was immediately asked

21 about his BWC and whether it was functioning properly. Muir repeatedly asked

22 Plaintiff about the functioning of the BWC, which caused Plaintiff to ask what was

23 the purpose of the meeting.

24    103.   Muir informed Plaintiff that during a supposed "Random Audit" of

25 Plaintiff's BWC, Muir found something that needed investigating.  Muir then asked

26 Plaintiff why Plaintiff turned off his BWC after a contact with a transient at 10:30

27 AM that morning.  Plaintiff replied that his BWC was not off.

28    104.   Plaintiff then informed Muir that when Plaintiff was ordered to change

uniforms last school year, he indicated to his superiors that the body camera didn't sit right on the polo shirts. In response, Lt. Kim allowed and granted Plaintiff permission to alter the location of the body camera and place it just below his belt, along his thigh because it filmed better. The problem was, that the body camera has a "Officer Down" feature and if the BWC is placed in a flat position, an alarm goes off to everyone in the department.

105.   To combat this issue, there is an "Off-Duty" function that allows the camera to be "off-duty" and be placed "on-duty" with the same activation pad as if it was in "On-duty." So when Plaintiff drives in the Patrol vehicle, he places it in "off-duty" so the alarm doesn't sound.

106.   Muir did not believe that the BWC could be activated from the "off-duty" position, and demanded that Plaintiff show him. After Plaintiff showed the sergeants, Muir was apparently satisfied with Plaintiff's explanation, but then ordered Plaintiff to change uniforms again to the Class B uniform so that the BWC would always be "on-duty". Plaintiff did not want to argue, so he agreed and left.

107.   At approximately 3:22 PM, Plaintiff re-approached Sgt. Muir because he wanted to ask more questions about the meeting earlier. Plaintiff was aware that Brandon Browning (Swing Shift Patrol Sgt. and ESPOA Vice President) was in the room with Sgt. Muir.

108.   Sgt. Muir indicated to Plaintiff that the meeting was not an Internal affairs investigation, and merely that Muir found something during a random audit and needed to investigate.

109.   When Plaintiff asked, "then why was it a "closed door" meeting with another Sergeant" Muir stated, "I needed someone else in case you said something crazy."

110.   While driving him that day, Plaintiff called Brandon Browning, who told Plaintiff that when Browning first arrived into the Watch Commanders Officer, Sgt. Muir was on the phone and he kept saying: "I'm sorry Lieutenant" and "I made a

mistake." Browning told Plaintiff that when Sgt. Muir hung up the phone with Plaintiff, "[Muir] looked like he saw a ghost."

111.   Browning asked Muir what happened and Muir stated: "I made a bone head mistake" and "I messed up."

112.   Browning further informed Plaintiff that Muir admitted to Browning that Muir didn't mean to send Plaintiff the email and that the email was meant for Lieutenant Kim. Muir continued to protest that there was a "Random BWC Audit," but could not look Browning in the face while saying it.

113.   Based on Muir's actions, both Browning and Plaintiff believed that Muir was lying about the Random BWC Audit, and that Lieutenant Kim ordered Muir to audit Plaintiff's BWC in an effort to find and/or concoct potential disciplinary infractions to be used against Plaintiff.

114.   Beginning on or about the week of May 25, 2020, Plaintiff went on FMLA leave from ESPD to help care for his newborn child. Plaintiff was scheduled to return to work on August 14, 2020.

115.   During his leave, Plaintiff would become physically ill at the prospect of returning to work for ESPD. Knowing what retaliation waited for him upon his return, Plaintiff submitted his resignation to ESPD, resulting in Plaintiff's constructive termination on August 14, 2020.

## FIRST CLAIM FOR RELIEF

### Retaliation 42 USC § 1983

### (Against Defendants City, Mitnick, Chief Whalen in his representative capacity, and DOES 1-10)

116.   Plaintiff repeats and realleges each of the allegations set forth above.

117.   At all times herein mentioned, 42 U.S.C. §1983 was in full force and effect and was binding upon Defendants, and each of therm.

118.   Plaintiff spoke as a private citizen when he questioned, disagreed with, or otherwise criticized policies, budgets, and other political matters of the City of El

Segundo, pursuant to his position as President of ESPOA.

119.    Plaintiff exercised his right of free speech and of association through his participation in and status as the President of the El Segundo Police Officers Association.

120.    At all times herein mentioned, Defendants, and each of them, had actual and/or constructive knowledge of Plaintiff s speech and associational membership.

121.    Defendant's, and each of them, retaliated against Plaintiff for his speech and association with the ESPOA, including, but not limited to, by:

    i.    Not including Plaintiff in overtime for the 2019 National Night Out planning, even though Plaintiff was instrumental in bringing the even to El Segundo in 2018.

    ii.    Refusing to offer Plaintiff to work certain over-time events that other Community Engagement Division employees were offered.

    iii.    Refusing to offer Plaintiff over-time opportunity relating to the 2019 Harvest Festival.

    iv.    Ordering Plaintiff not to attend School Attendance Review Board meetings because the meetings were held on Plaintiff's regular day off and Plaintiff would otherwise be entitled to over-time, even though pursuant to the General Orders Manual, the School Resource Officer SHALL attend SARB meetings.

    v.    Shunning Plaintiff and constructively forcing him to leave the Special Weapons and Tactics (SWAT) team, which was an almost all over-time assignment.

    vi.    Removing Plaintiff from the "short list" of officers called to fill immediate patrol overtime assignments.

    vii.    Refusing to investigate Plaintiffs written personnel complaints.

    viii.    Giving Plaintiff untrue and false "write-ups" and a false yearly evaluation based on fabrications for the sole purpose of adversely affecting Plaintiff's

promotability.

ix.    Instructing Plaintiff that he could not be promoted to Sergeant until he resigned his position on the Board of ESPOA.

x.    Verbally disciplining Plaintiff for minor infractions that are not enforced against non-members of the board of ESPOA, such as for not "signing on" via the radio each morning and Plaintiff being told he cannot attend morning briefings on his own time, if early to work, to learn about daily updates/cases/major incidents going on that day that could and would be beneficial to his overall safety.

xi.    Ordering Plaintiff to change uniforms during a security detail/executive protection detail even though Plaintiff was wearing an approved SRO uniform pursuant to the GOM.

xii.    Communicating to Command Staff that Plaintiff was not loyal to ESPD.

xiii.    Knowingly communicating to Command Staff false statements about Plaintiff and all members of the ESPOA and the ESPOA Board members including, but not limited to, calling Plaintiff and ESPOA Board members: "gang-members;" "organizational terrorists;" "rogues;" "liars;" and "the group trying to get Chief Whalen Fired."

xiv.    Refusing to promote members of the ESPOA Board by adopting an official policy deeming all ESPOA Board Members, including Plaintiff, "not loyal," thereby preventing ESPOA Board Members from career advancement

xv.    Isolating Plaintiff from nearly all functions of the Community Affairs Division, including isolating Plaintiff from contact with El Segundo City Council members during his normal working hours

xvi.    Publically declaring that being on the ESPOA Board is a Career Killer.

xvii.    Permitting and ordering illegal "audits" of Plaintiff's BWC footage and attempting to discover and/or manufacture false and untrue disciplinary charges against Plaintiff.

122.   As a direct, foreseeable and proximate result of Defendants retaliatory conduct, Plaintiff suffered and continues to suffer humiliation, embarrassment, anxiety, mental anguish and emotional distress. Said conduct has adversely affected his personal health and well-being, which may include medical expenses that are anticipated into the future and may force an early retirement. Plaintiff s damages are continuing and in an amount not yet determined, but in excess of the jurisdictional minimums of this court.

123.   As a direct, foreseeable and proximate result of the Defendants' retaliatory conduct, Plaintiff suffered and continues to suffer losses in earnings and other employment benefits all to his damage in an amount in excess of the minimum jurisdictional limits of this court, the precise amount of which will be proven at trial.

124.   As a further legal result of the above-described conduct of Defendants, and each of them, Plaintiff has and will continue to incur attorneys' fees and costs in an amount according to proof.

## SECOND CLAIM FOR RELIEF

### Municipal Liability – Ratification (42 USC § 1983)

### (Against Defendants City, Mitnick, Chief Whalen in his representative capacity, and DOES 1-10)

125.   Plaintiff repeats and realleges each of the allegations set forth above.

126.   Defendants Chief Bill Whalen, Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez, and DOES 1-10 acted under color of law as expressly and/or impliedly authorized and/or approved of by defendant Mitnick.

127.   The actions of Chief Bill Whalen, Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez, and DOES 1-10 deprived Plaintiff of his particular rights under the United States Constitution.

128.   Upon information and belief, Mitnick delegated his final policy and decision making authority to Chief Bill Whalen such that Whalen was the *de facto* final policy maker, acting under color of law, who had final policymaking authority concerning the acts of other members of Command Staff, including, but not limited to, Defendants Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez, and ratified (or will ratify) Defendants Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez, and DOES 1-10 acts and the bases for them.

129.   Upon information and belief, Mitnick, the final policymaker knew of and/or should have known of and/or was deliberately indifferent to and/or specifically approved of (and/or will approve of) Defendants Chief Bill Whalen, Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez acts.

130.   Upon information and belief, Mitnick, a final policy maker has determined (and/or will determine) that the acts of Defendants Chief Bill Whalen, Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez were "within policy."

131.   By reason of the aforementioned acts and omissions, Plaintiff was injured, the aforementioned acts and omissions also caused Plaintiff's injuries.

132.   Accordingly, Defendants City and DOES 1-10 each are liable to Plaintiff for compensatory damages under 42 USC § 1983.

133.   Plaintiff seeks attorney's fees under this claim.

///
///
///

- 26 -

## **THIRD CLAIM FOR RELIEF**

**Municipal Liability – Unconstitutional Custom or Policy (42 USC § 1983)**

**(Against Defendants City, Mitnick, Chief Whalen in his representative capacity, and DOES 1-10)**

134.   Plaintiff repeats and realleges each of the allegations set forth above.

135.   Defendants Chief Bill Whalen, Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez, and DOES 1-10 acted under color of law as expressly and/or impliedly authorized and/or approved of by defendant Mitnick.

136.   Defendants Mitnick, Chief Bill Whalen, Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez, and DOES 1-10 acted pursuant to an expressly adopted official policy or a longstanding practice or custom of the Defendant City and Command Staff.

137.   On information and belief, Defendants Chief Bill Whalen, Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez, and DOES 1-10 were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with their treatment of Plaintiff's and the egregious conduct complained of herein.

138.   Defendants Mitnick, Chief Bill Whalen, Captain Carlos Mendoza, Captain Jamie Bermudez, Lieutenant Ray Garcia, Lieutenant Dan Kim, Lieutenant Jeff Leyman, Lieutenant Aaron Corkins, Lieutenant Hugo Perez, and DOES 1-10, together with other City policymakers and supervisors, maintained, inter alia, the following unconstitutional customs, practices, and policies:

i.   Refusing to promote members of the Board of ESPOA solely based on the member's status as a member of the Board of ESPOA;

- 27 -

ii. Permitting and encouraging the unlawful retaliation against members of the Board of ESPOA for the lawful actions taken pursuant to the members' status as a member of the Board for ESPOA;

iii. Refusing to investigate legitimate personnel complaints initiated by members of the Board of ESPOA;

iv. Refusing to investigate legitimate issues relating to the unlawful "leaking" of promotional exam questions;

v. Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining, and controlling misconduct by City officers;

vi. Failing to adequately discipline City officers for the above referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct;

vii. Announcing that all board members of the ESPOA were not loyal to the department and awarding a score of non-loyal when determining promotability of ESPOA Board Members, which has the effect of denying promotion and career advancement of all ESPOA Board Members.

viii. Permitting and initiating illegal "audits" of Plaintiff's BWC footage and attempting to discover and/or manufacture false and untrue disciplinary charges against Plaintiff.

139. By reason of the aforementioned acts and omissions of Defendants City, Mitnick and DOES 1-10, Plaintiff was injured.

140. Defendants City, Mitnick, and DOES 1-10, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above. Despite having knowledge as stated above, these defendants condoned, tolerated, and through actions and inactions thereby ratified such policies. Said defendants also acted with

deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Plaintiff and other individuals similarly situated.

141.   By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct and other wrongful acts, DOES 1-10 acted with intentional, reckless, and callous disregard for the life of Plaintiff and Plaintiff's constitutional rights. Furthermore, the policies, practices, and customs implemented, maintained, and still tolerated by Defendants City and DOES 1-10 were affirmatively linked to and were a significantly influential force behind the injuries of Plaintiff.

142.   On information and belief, the aforementioned acts were willful, wanton, malicious, and oppressive thereby justifying the awarding of exemplary and punitive damages as to DOES 1-10.

143.   Accordingly, Defendants City and DOES 1-10 each are liable to Plaintiff for compensatory damages under 42 USC §1983.

144.   Plaintiff also seeks attorney's fees under this claim.

## FOURTH CLAIM FOR RELIEF

**Discrimination for Participation in Employee Representative Organization - Cal. Gov. Code § 3506**

**(Against City and DOES 1-10)**

145.   Plaintiff repeats and realleges each of the allegations set forth above.

146.   Defendants are public agencies and/or employee organizations within the meaning of the California Government Code.

147.   Plaintiff is a public employee within the meaning of the California Government Code. Plaintiff's exercise of his rights under California Government Code section 3502 is a protected activity.

148.   Defendants' conduct was not justified by a legitimate business purpose and tended to interfere with, intimidate, restrain, coerce, and/or discriminate against Plaintiff because of his organizational activities.

- 29 -

149.   The violation was malicious, wanton, oppressive, and accomplished with intent to injure Plaintiff, a public safety officer.

150.   As a direct, foreseeable and proximate result of the Defendants' conduct, Plaintiff suffered and continues to suffer losses in earnings and other employment benefits all to his damage in an amount in excess of the minimum jurisdictional limits of this court, the precise amount of which will be proven at trial.

151.   As a further legal result of the above-described conduct of Defendants, and each of them, Plaintiff has and will continue to incur attorneys' fees and costs in an amount according to proof.

152.   The conduct of Defendants Command Staff and DOES 1-10 was a substantial factor in causing Plaintiff's harms, losses, injuries, and damages.

## FIFTH CLAIM FOR RELIEF

**Retaliation for Exercise of Lawful Action as Elected Representative of Employee Bargaining Unit - Cal. Gov. Code § 3502.1**

**(Against City, and DOES 1-10)**

153.   Plaintiff repeats and realleges each of the allegations set forth above.

154.   At all times relevant to this claim, Plaintiff was the duly elected president of ESPOA.

155.   Defendants' conduct subjected Plaintiff to punitive action and/or denied him promotion, and/or threatened Plaintiff with such treatment, for the exercise of lawful actions as an elected, appointed, and/or recognized representative of ESPOA, in violation of Cal. Gov't Code § 3502.1.

156.   Defendant City is vicariously liable for the wrongful acts of Defendants Command Staff and DOES 1-10 pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of employment if the employee's act would subject him or her to liability.

157.   Defendant DOES 1-10 are vicariously liable under California law and

1  the doctrine of respondeat superior.

2      158.   The conduct of Defendants was malicious, wanton, oppressive, and

3  accomplished with a conscious disregard for Plaintiff's rights, justifying an award of

4  exemplary and punitive damages as to Defendants Command Staff and DOES 1-10.

5      159.   As a direct, foreseeable and proximate result of the Defendants'

6  discriminatory and retaliatory conduct, Plaintiff suffered and continues to suffer

7  substantial losses in earnings and other employment benefits all to his damage in an

8  amount in excess of the minimum jurisdictional limits of this court, the precise

9  amount of which will be proven at trial.

10     160.   As a further legal result of the above-described conduct of Defendants,

11 and each of them, Plaintiff has and will continue to incur attorneys' fees and costs in

12 an amount according to proof.

13                    **SIXTH CLAIM FOR RELIEF**

14              **Violation of Tom Bane Act - Cal. Civil Code § 52.1**

15 **(Against City, Mitnick, and Individually Against Chief Whelan, Lt. Kim, Capt.**

16                    **Bermudez, and DOES 1-10)**

17     161.   Plaintiff repeats and realleges each of the allegations set forth above.

18     162.   Defendants Command Staff in their individual capacities, and DOES 1-

19 10, in their individual capacities, as described in more detail herein above, while

20 working for Defendant City and acting within the course and scope of their duties,

21 intentionally threatened, intimidated, and/or coerced, and/or attempted to interfere by

22 threat, intimidation, and/or coercion, with Plaintiff's exercise and/or enjoyment of his

23 rights secured by the U.S. Constitution or laws of the United States, and/or of the

24 rights secured by the Constitution or laws of this state.

25     163.   Defendants commission of the acts complained of herein interfered with

26 and/or attempted to interfere with Plaintiff's civil rights to freedom of association

27 and/or, freedom of speech, to due process, to equal protection of the laws, to be free

28 from state actions that shock the conscience, and to life, liberty, and property.

164.    Defendants and each of their commission of the acts complained of herein further interfered with and/or attempted to interfere with Plaintiff's California State law rights to be free from retaliation of any kind with regard to his membership in a public employee union or collective bargaining unit. (Cal. Gov't Code § 3502.1).

165.    On information and belief, Defendants intentionally and spitefully committed the above acts to discourage Plaintiff from exercising his rights, to retaliate against him for invoking such rights, and/or to prevent him from exercising such rights, which he was fully entitled to enjoy.

166.    On information and belief, Plaintiff reasonably believed and understood that the acts committed by Defendants Command Staff and DOES 1-10 were intended to discourage Plaintiff from exercising the above rights, to retaliate against him for invoking such rights, and/or to prevent him from further exercising such rights.

167.    Defendants Command Staff and DOES 1-10 successfully interfered with the above civil rights of Plaintiff.

168.    The conduct of Defendants Command Staff and DOES 1-10 was a substantial factor in causing Plaintiff's harms, losses, injuries, and damages.

169.    Defendant City is vicariously liable for the wrongful acts of Defendants Command Staff and DOES 1-10 pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of employment if the employee's act would subject him or her to liability.

170.    Defendant City is vicariously liable for the wrongful acts of Defendants Command Staff and DOES 1-10 under California law and the doctrine of respondeat superior.

171.    The conduct of Defendants was malicious, wanton, oppressive, and accomplished with a conscious disregard for Plaintiff's rights, justifying an award of exemplary and punitive damages as to Defendants Command Staff and DOES 1-10 in their individual capacities.

172.   Plaintiff seeks attorney's fees under this claim.

**SEVENTH CLAIM FOR RELIEF**

**Whistle Blower Retaliation in Violation of Cal. Lab. Code § 1102.5**

**(Against Defendants City, and DOES 1-10.)**

173.   Plaintiff repeats and realleges each of the allegations set forth above.

174.   The lawful actions of Plaintiff described herein were protected activity under California law, the California Constitution, and the United States Constitution.

175.   Defendants' adverse employment actions taken against Plaintiff as set forth herein occurred in retaliation for Plaintiff's lawful actions, complaints, and "whistleblowing" activities against individual members of Command Staff's and other illegal activity, as hereinabove alleged. Such actions are and were unlawful, discriminatory and retaliatory in violation of Cal. Lab. Code §1102.5, and resulted in damages and injury to Plaintiff, as alleged herein, including but not limited to lost wages and benefits.

176.   As a proximate result of this retaliatory conduct in violation of public policy, Plaintiff was caused to suffer, and continues to suffer, from humiliation, anxiety, severe emotional distress, worry, fear, and special damages (to include lost wages and other employment benefits) all to Plaintiff's special and general damage according to proof at the time of trial, but in an amount not less than $1,000,000.00.

177.   Defendants' adverse employment actions, which include, but are not limited to, threats, harassment, and intimidation of Plaintiff, and discrimination against the terms and conditions of Plaintiff's employment, were all against public policy, were obnoxious, despicable, and ought not to be suffered by any member of the community. Command Staff did the things hereinabove alleged, intentionally, oppressively, and maliciously with an evil and malevolent motive to injure Plaintiff.

178.   All actions of Defendants, and each of them, were known, ratified and approved by the officers or managing agents of Defendants, and each of them. Therefore, Plaintiff is entitled to punitive or exemplary damages against Defendants,

- 33 -

1  and each of them, in an amount to be determined at the time of trial.

2  ## EIGHTH CAUSE OF ACTION

3  **(Wrongful Termination (Constructive) – Against City, and Does 1-10)**

4  179.   Plaintiff realleges and incorporates by reference all of the allegations

5  above.

6  180.   Plaintiff was Defendants' employee as that term is defined and used

7  pursuant to Cal. Lab. Code § 2750, et seq., and Cal. Gov. Code § 12900, et seq., and

8  common law.

9  181.    Defendants' harassing conduct was so severe, pervasive, extraordinary

10  and egregious that Plaintiff was forced to leave his employment with Defendants,

11  resulting is Plaintiff's constructive termination in August 2029, in violation of

12  common law, and the public policy expressed in California law.

13  182.   As a proximate result of this wrongful termination in violation of public

14  policy, Plaintiff was caused to suffer, and continues to suffer, from humiliation,

15  anxiety, severe emotional distress, worry, fear, and special damages (to include lost

16  wages) all to his special and general damage according to proof at the time of trial.

17  183.   Defendants  did  the  things  hereinabove  alleged,  intentionally,

18  oppressively, and maliciously with an evil and malevolent motive to injure Plaintiff.

19  These acts, which resulted in his wrongful termination against public policy, were

20  obnoxious, despicable, and ought not to be suffered by any member of the community.

21  184.   All actions of Defendants, and each of them, were known, ratified and

22  approved  by  the  officers  or  managing  agents  of  Defendants,  and  each  of  them.

23  Therefore,  Plaintiff  is  entitled  to  punitive  or  exemplary  damages  against  the

24  Defendants, and each of them, in an amount to be determined at the time of trial.

25  ## PRAYER FOR RELIEF

26  WHEREFORE, Plaintiff requests entry of judgment in his favor and against

27  Defendants City of El Segundo, Scott Mitnick in his official capacity, Chief Bill

28  Whalen in his individual and official capacities, Captain Carlos Mendoza in his

- 34 -

individual and official capacities, Captain Jamie Bermudez in his individual and official capacities, Lieutenant Ray Garcia in his individual and official capacities, Lieutenant Dan Kim in his individual and official capacities, Lieutenant Jeff Leyman in his individual and official capacities, Lieutenant Aaron Corkins in his individual and official capacities, Lieutenant Hugo Perez in his individual and official capacities, and DOES 1 – 10 in their individual and official capacities, inclusive, as follows:

A. For compensatory damages under federal and state law, in an amount to be proven at trial;

B. Medical expenses and loss of earnings;

C. For punitive damages against the individual defendants in an amount to be proven at trial;

D. For interest;

E. For reasonable costs of the suit and attorneys' fees pursuant to statute; and

F. For such further and other relief as the Court may deem just, proper, and appropriate.

DATED: August 21, 2020          RESPECTFULLY SUBMITTED,
                                **LIPELES LAW GROUP, APC**


By:        /s/ Kevin A. Lipeles
          Kevin A. Lipeles, Esq.
          Attorneys for Plaintiff,
          Joseph Cameron

///
///
///

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

DATED: August 21, 2020          RESPECTFULLY SUBMITTED,
                                **LIPELES LAW GROUP, APC**


By:  _____/s/ Kevin A. Lipeles_____
     Kevin A. Lipeles, Esq.
     Attorneys for Plaintiff,
     Joseph Cameron